IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ACUMENT GLOBAL TECHNOLOGIES, INC. and
ACUMENT GLOBAL TECHNOLOGIES, INC. PENSION
PLAN,

                    Plaintiffs,

      v.

TOWERS WATSON & CO. and TOWERS WATSON
INVESTMENT SERVICES, INC. (F/K/A WATSON
WYATT INVESTMENT CONSULTING, INC.),

                    Defendants and Third-
                    Party Plaintiffs,

      v.

WESTRIDGE CAPITAL MANAGEMENT, INC., WG
TRADING COMPANY LP, WG TRADING INVESTORS,
LP, STEPHEN WALSH AND PAUL GREENWOOD,

                    Third-Party
                    Defendants.

_____

TOWERS WATSON & CO. and TOWERS WATSON
INVESTMENT SERVICES, INC.,

                    Counterclaim
                    Plaintiffs,

      v.

ACUMENT GLOBAL TECHNOLOGIES, INC.,

                    Counterclaim
                    Defendant.

No. 1:12-cv-00506-LLS

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

I.     Watson Wyatt's Investment Consulting Services .................................................3

II.    Westridge Capital Management ............................................................................4

III.   The Acument Pension Plan ...................................................................................5

IV.   Acument Becomes an AIS Client of Watson Wyatt .............................................6

V.    The Westridge Fraud ...........................................................................................8

PROCEDURAL HISTORY ................................................................................................8

SUMMARY JUDGMENT STANDARD ..........................................................................9

ARGUMENT ...................................................................................................................10

I.     Watson Wyatt's Alleged Failure To Exercise Diligence and Prudence Did Not Cause the Plan Harm (Count I). ...................................................................10

     A.    Plaintiffs' Allegations .............................................................................11

     B.    Plaintiffs Cannot Establish the Element of Causation. ..........................11

II.    Defendants Did Not Provide Materially Misleading Information, and Any Alleged Failure To Disclose Information Was Not the Actual or Proximate Cause of Harm To the Plan (Count II). ..............................................18

     A.    Plaintiffs' Allegations .............................................................................19

     B.    Plaintiffs Cannot Establish the Element of Breach. ...............................19

          1.    ERISA's Duty of Loyalty, at Most, Prohibits Watson Wyatt from Intentionally Providing Materially Misleading Information ......................19

          2.    Watson Wyatt Disclosed Substantial Information About Westridge's Structure and Strategy To Acument. ....................................21

          3.    Plaintiffs Are Estopped from Disavowing Acument's Representations and Warranties in the Execution Documents. .................25

          4.    Plaintiffs' Remaining Allegations Are Based on Incorrect Factual Premises. ....................................................................................29

     C.    Plaintiffs Cannot Establish that Any Alleged Failure To Disclose Material Information Was the Actual or Proximate Cause of Harm To the Plan. ..............32

          1.    Even If Watson Wyatt Had Provided More Information About Westridge, Acument Would Not Have Rejected the Recommendation. ..............................................................................32

          2.    Even If Acument Would Have Rejected the Recommendation If Certain Alleged Risks Had Been Disclosed, Those Were Not the Risks that Materialized. ..............................................................................34

III.    Watson Wyatt Did Not Fail To Act in Accordance with Plan Documents (Count III). ....................................................................................................................36

    A.    Plaintiffs Should Be Estopped from Alleging that the Westridge Investment Violated the Investment Policy. ...........................................36

    B.    The Undisputed Record Demonstrates That Westridge Was Appropriately Classified as a Large Cap Equity Investment. .......................................37

IV.    Watson Wyatt Did Not Fail To Adequately Diversify Plan Assets (Count IV). ..............39

    A.    Plaintiffs Should Be Estopped from Alleging that the Westridge Investment Violated ERISA's Diversification Requirement. ...............................40

    B.    The Undisputed Record Demonstrates that the Westridge Investment Did Not Violate ERISA's Diversification Requirements. ...........................................40

CONCLUSION .............................................................................................................42

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aetna Cas. & Sur. Co. v. Aniero Concrete, Co.*, 404 F.3d 566 (2d Cir. 2005)...........................25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................10

*Bd. of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662 (S.D.N.Y. 2011) ......................................................................12, 21

*Bd. of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139 (2d Cir. 1997) ...................................................................................20

*Bell v. Pfizer, Inc.*, 626 F.3d 66 (2d Cir. 2010)..........................................................20

*Boehner v. McDermott*, 332 F. Supp. 2d 149 (D.D.C. 2004) .........................................32

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................9

*Cobell v. Norton*, 283 F. Supp. 2d 66 (D.D.C. 2003) ...................................................13

*Dickerson v. Napolitano*, 604 F.3d 732 (2d Cir. 2010) ..................................................9

*Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337-Civ.-JORDAN, 2007 WL 2263892 (S.D. Fla. Aug. 7, 2007)........................................................................13

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189 (2d Cir. 2003) .......................................................................................35

*FDIC v. Nat'l Union Fire Ins. Co.*, 205 F.3d 66 (2d Cir. 2000)......................................31

*Federal Election Comm'n v. Toledano*, 317 F.3d 939 (9th Cir. 2002).........................31

*Fink v. Nat'l Savings and Trust Co.*, 772 F. 2d 951 (D.C. Cir. 1985) ...........................12

*Fisher v. JP Morgan Chase & Co.*, 703 F. Supp. 2d 374 (S.D.N.Y. 2010) ................20

*Goodwin Properties, LLC v. Acadia Group, Inc.*, No. 01-49-P-C, 2001 WL 800064 (D. Me. July 17, 2001).............................................................13, 28

*Gray v. Citigroup Inc.*, 662 F.3d 128 (2d Cir. 2011)............................................20, 25

*Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010)..........................................................9

*Huddleston v. Herman & MacLean*, 640 F.2d 534 (5th Cir. 1981).............................35

*I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 182 F.3d 51 (1st Cir. 1999)...........31

*In re Am. Express Co. ERISA Litig.*, 762 F. Supp. 2d 614 (S.D.N.Y. 2010) ...............................20

*In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405 (S.D.N.Y. 2009) ........................................13

*In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386 (S.D.N.Y. 2010) ...........................................30

*In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) ...................................13

*Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706 (2d Cir. 2001)..........................25, 26

*Krauss v. Oxford Health Plans, Inc.*, 418 F. Supp. 2d 416 (S.D.N.Y. 2005) ...............................20

*Kuper v. Quantum Chemicals Corp.*, 852 F. Supp. 1389 (S.D. Ohio 1994) ................................13

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).......................................................35

*Liss v. Smith*, 991 F. Supp. 278 (S.D.N.Y. 1998) .............................................................12, 40, 41

*McCabe v. Capital Mercury Apparel*, 752 F. Supp. 2d 396 (S.D.N.Y. 2010)........................11, 37

*Meinhardt v. Unisys Corp.*, 173 F.3d 145 (3d Cir. 1999)............................................................13

*Noz v. Value Investing Partners, Inc.*, No . 98 Civ. 6977 (RO), 1999 WL 387400
     (S.D.N.Y. June 14, 1999)........................................................................................................28

*Osberg v. Foot Locker, Inc.*, 907 F. Supp. 2d 527 (S.D.N.Y. 2012) ..............................................9

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.
     Morgan Stanley Inv. Mgmt.*, 712 F.3d 705 (2d Cir. 2013) ................................................41, 42

*Porter v. Shearson Lehman Bros. Inc.*, 802 F. Supp. 41 (S.D. Tex. 1992) ..................................29

*Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000).......................................................................29

*Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994)...............................................12

*Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98 (2d Cir. 1998) ............................................11

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir.
     2001) ....................................................................................................................................35

*Supernova Sys., Inc. v. Great Am. Broadband, Inc.*, No. 1:10-cv-319, 2012 WL
     425552 (N.D. Ind. Feb. 9, 2012)............................................................................................28

*Tatum v. R.J. Reynolds Tobacco Co.*, 926 F. Supp. 2d 648 (M.D.N.C. 2013) ............................14

*United States v. Mason Tenders Dist. Council of Greater N.Y.*, 909 F. Supp. 882
     (S.D.N.Y. 1995).....................................................................................................................12

*Wright v. Goord*, 554 F.3d 255 (2d Cir. 2009) ...............................................................9

*Wright v. Nat'l Warranty Co.*, 953 F.2d 256 (6th Cir. 1992) .......................................28

## OTHER AUTHORITIES

29 U.S.C. § 1104...........................................................................................................19

29 U.S.C. § 1109...........................................................................................................12

Fed. R. Civ. P. 56...........................................................................................................9

**<u>INTRODUCTION</u>**

In February 2009, after more than 25 years in operation, it was discovered that two of the principals of Westridge Capital Management, Inc. ("Westridge") had been stealing from the funds they managed.  The fraud impacted more than forty of Westridge's sophisticated investors, many of whom had invested in Westridge at the recommendation of investment advisors such as Mercer Investment Consulting, Cambridge Associates, and Wilshire Associates.  That the fraud went undetected for so many years by Westridge's regulators (including the SEC) and its auditors (including Deloitte & Touche LLP) is an important fact in this case.

Unfortunately, the Acument Global Technologies, Inc. Pension Plan ("Acument Plan" or "Plan") was one of the investors impacted by the fraud.  In this case, the Acument Plan and its named fiduciary, Acument Global Technologies, Inc. ("Acument") (collectively "Plaintiffs") claim the Plan's investment advisor, Watson Wyatt Investment Consulting, Inc. ("Watson Wyatt"), is at fault for the Plan's losses.  Plaintiffs sued Watson Wyatt's successor companies Towers Watson & Co. and Towers Watson Investment Services, Inc. ("Defendants") in January 2012.  After extensive discovery, however, the evidence shows that Plaintiffs' claims against Watson Wyatt are not sustainable.

There are, to be sure, facts in this case that are in dispute, but even construing the facts in the light most favorable to Plaintiffs, Plaintiffs cannot meet their burden of proof on one or more elements in any of the four counts in their Complaint.  Count I alleges that Watson Wyatt failed to exercise diligence and prudence.  Although the parties' experts disagree about the applicable standard of care, Plaintiffs cannot prove causation under either standard: no matter what due diligence Watson Wyatt was reasonably expected to conduct, it would not have discovered the fraud, and its recommendation of Westridge would not have been *objectively imprudent*.

Count II alleges that Watson Wyatt breached its duty of loyalty by failing to disclose material information.  But ERISA's duty of loyalty, at most, prohibited Watson Wyatt from intentionally providing *materially misleading* information, which Plaintiffs do not allege.  Regardless, discovery has revealed that Watson Wyatt in fact disclosed to Acument in the investment's subscription documents most or all of the information Plaintiffs contend was not disclosed.  Moreover, Acument represented in the subscription agreement that it reviewed, understood, and was comfortable with the disclosed information.  Finally, any alleged failure to disclose information was neither the "but for" nor proximate cause of harm to the Plan.

Counts III and IV allege that Watson Wyatt violated Acument's Investment Policy and ERISA's diversification requirements because Westridge was misclassified as a large cap equity investment, rather than a hedge fund.  Plaintiffs should be estopped from pursuing these claims because they are in conflict with Acument's signed representations and warranties, in which it represented that the investment would be consistent with the objectives of the Plan, the Plan's governing documents, and ERISA's diversification requirements.  Regardless, Westridge was appropriately classified as a large cap equity investment because it was benchmarked to the S&P 500 Index, a large cap equity index, and its reported returns had a 99.98% correlation with that Index.  In addition, Westridge described itself as a large cap equity investment and was typically classified as a large cap equity investment within the investment community.

For all these reasons, summary judgment is appropriate with respect to Count I (on causation grounds), Count II (breach and causation), Count III (breach), and Count IV (breach).

**BACKGROUND**[1]

## I.    Watson Wyatt's Investment Consulting Services

Watson Wyatt was an investment consulting and advisory firm that provided expert investment consulting services.[2]  Watson Wyatt offered two types of investment consulting services between 2007 and 2009: an advisory service and a discretionary service.  When advising a client regarding investment manager selection under its advisory service, Watson Wyatt provided the client a list of potential managers along with Watson Wyatt's internal research on each manager.  Under Watson Wyatt's discretionary (or Advanced Investment Solutions ("AIS")) service, Watson Wyatt assumed a larger role in investment manager selection.  Instead of providing a client a list of potential managers, Watson Wyatt would select the manager it believed was best for the client and then recommend that manager to the client.  Although Watson Wyatt assumed a larger role in manager selection under its AIS program, the client retained ultimate authority over which managers were hired.

In the AIS program, Watson Wyatt would select investment managers for a client portfolio, and recommend managers to the client, through a collaborative process involving manager researchers, client consultants, and the AIS Oversight Committee ("AISOC").  Watson Wyatt's manager researchers were divided into teams based on the employees' Areas of Specialized Knowledge ("ASK"), such as U.S. Large Cap Equity, U.S. Small Cap Equity, Hedge Fund of Funds, and Fixed Income.  The ASK teams' due diligence involved investigating

---

[1] The "Background" section is designed to give the Court a context in which to consider the precise issues presented by this Motion.  The facts in this section are not essential to the issues raised by this Motion and thus are not contained in the Statement of Undisputed Material Facts.  Defendants have endeavored to keep this section succinct and to base it on facts that Plaintiffs have expressly not contested in the parties' exchange of proposed findings of fact that has occurred over the last few weeks.

[2] In January 2010, Watson Wyatt merged with Towers Perrin Forster & Crosby to form Towers Watson & Co.  These entities will be referred to in this Memorandum without distinction as "Watson Wyatt."

3

qualitative and quantitative factors relating to a manager's people, processes, and performance in order to gain an understanding of the investment manager's strategy and the likelihood that the manager would outperform its benchmark in the future.  As a result of the ASK teams' due diligence, they would assign managers a Future Returns Expectations ("FREX") rating.

Before recommending a manager for inclusion in an AIS client's portfolio, the client consultants would submit to the relevant ASK teams manager search profiles tailored to the client's "risk budget."  The ASK teams would discuss the profiles, both internally and with Watson Wyatt's client consultants to obtain a better understanding of client-specific considerations.  The ASK teams' recommendation would then be submitted to the AISOC for approval.  Upon receiving AISOC approval, the client consultants would recommend the selected manager to the client.

## II.     Westridge Capital Management

Westridge Capital Management, Inc. was an investment manager that managed an enhanced index strategy benchmarked to the S&P 500 Index.[3]  Westridge's strategy entailed two distinct components: an alpha and a beta component.  The beta component of Westridge's strategy involved obtaining exposure to the S&P 500 Index through futures contracts.  Westridge then tried to enhance those market-based returns through its alpha component, which involved an index arbitrage strategy.  The index arbitrage was conducted by Westridge's affiliated broker-dealer, WG Trading Company ("WGTC").  The index arbitrage strategy involved buying long index stocks and short index futures contracts when there was a pricing difference between the stocks and futures indices such that there was an opportunity for profitable arbitrage.  As

---

[3] This paragraph describes Westridge's investment strategy as Westridge represented that strategy to the investment community prior to the revelation of the fraud.

reported by Westridge, the strategy resulted in small but consistent returns (alpha) over its

benchmark, the S&P 500 Index.

Watson Wyatt began researching Westridge in 1999.  Jeff Nipp, Watson Wyatt's director

of manager research, met or spoke with Westridge representatives on at least six occasions

between 1999 and 2008.  Watson Wyatt's U.S. Large Cap Equity ASK team assigned Westridge

a FREX 1 rating—its highest rating—in 1999, and reaffirmed that rating in 2005 and 2008.

### III.    The Acument Pension Plan

The Acument Plan is an employee pension benefit plan.  The Acument Plan's Master

Provisions ("Plan Document") state that the named fiduciary of the Plan is Acument "and any

additional person or persons as Acument may specifically designate in writing."  The Plan

Document further states that Acument "shall be the plan administrator and shall be solely

responsible for the general administration of the [Acument Plan] and for carrying out the

provisions thereof, and shall have such powers as may be necessary to do so."

The Plan was managed and administered by Acument's Investment Committee (the

"Investment Committee" or "Committee").  The chair of the Investment Committee from

October 2007 to February 2009 was Earl Talos, Acument's vice-president of human resources.

Prior to joining Acument, Mr. Talos served on the investment committee, or advised the

investment committee, of four different companies over an approximately ten-year period.

Janice Stipp, Acument's CFO, was on the Investment Committee from 2007 through 2010.  Prior

to joining Acument, Ms. Stipp had spent nearly a decade holding various financial positions at

different companies, including CFO, vice president of finance, vice president of corporate

controller, and finance director.  Ms. Stipp also served on one or two investment committees

prior to joining Acument.  John Clark, Acument's general counsel, has been on the Investment

Committee since its inception in 2006.  Joseph Gray, Acument's CEO, was on the Investment Committee between October 2007 and May 2008.

On June 2, 2008, Mr. Gray was replaced as CEO by Rick Dauch, who was introduced to the Plan in July 2008.  Prior to joining Acument, Mr. Dauch held, among other titles, the position of vice president of financial planning and investor relations at his former employer and occasionally attended that company's investment committee meetings.  In July 2008, Patrick Paige, Acument's chief administrative officer, also became a member of the Investment Committee.  Prior to joining Acument, Mr. Paige was vice president of human resources of his former employer, where he was a member of the investment committee.

## IV.    Acument Becomes an AIS Client of Watson Wyatt

Acument and Watson Wyatt entered into a Consulting Agreement effective December 1, 2007, which governed the relationship between Acument and Watson Wyatt as it related to the Acument Plan.  Pursuant to Exhibit A of the Consulting Agreement, Watson Wyatt served as a co-fiduciary of the Plan with Acument and its Investment Committee.  Exhibit A granted Watson Wyatt discretion to select investment managers for the Plan subject to the approval of Acument and its Investment Committee, as appropriate.  Watson Wyatt's consultants on the Acument account were Christopher Hemmer and Debra Woida.

Under Phase I of its service, Watson Wyatt worked with Acument to determine an appropriate asset allocation for the Plan.  During a January 21, 2008 meeting, Watson Wyatt recommended that Acument modify the Plan's asset allocation to 50% equity and 50% fixed income.  As a result of the January 21, 2008 meeting, Watson Wyatt scheduled a meeting with the Investment Committee for late February 2008 to discuss Phase II of its service.

Under Phase II of its service, Watson Wyatt worked internally to identify appropriate investment managers to recommend to Acument.  On January 23, 2008, Mr. Hemmer sent an

email to the heads of various ASK teams within Watson Wyatt requesting recommendations for managers for the Acument Plan, including an "Enhanced Index" U.S. large cap equity manager benchmarked to the S&P 500 Index.  Between February 15 and 17, 2008, AISOC approved the recommendation of the proposed slate of managers for the Acument Plan, including Westridge as the Plan's U.S. large cap equity manager**.**

Ms. Woida and Mr. Hemmer presented the recommended managers and asset class allocations to two members of Acument's Investment Committee, Messrs. Talos and Clark, at a meeting on February 26, 2008.  During the meeting, Mr. Hemmer and Ms. Woida recommended a revised asset allocation of 22% U.S. large cap equity, 6% U.S. small-mid cap equity, 15% international equity, 42% fixed income, and 15 % hedge fund of funds.  Mr. Hemmer and Ms. Woida also recommended managers for each asset allocation, including Westridge for the U.S. large cap equity asset allocation.  Messrs. Talos and Clark approved Watson Wyatt's recommendations.[4]

On June 5, 2008, Ms. Woida sent Mr. Clark, Acument's general counsel and a member of its Investment Committee, a copy of the subscription materials for the Westridge investment, including the subscription agreement and term sheet, and a letter of direction that would authorize the Plan's Trustee (State Street) to make the investment.  Mr. Talos, the chair of the Investment Committee, signed the Westridge subscription agreement and letter of direction on June 30, 2008.  Without Acument's approval, the Plan could not have invested with Westridge.

The Plan invested $56.5 million with Westridge between July 1, 2008, and January 22, 2009.

---

[4] On March 13, Mr. Hemmer met with Ms. Stipp, one of the two members of Acument's Investment Committee who did not attend the February 26 meeting, to review the information shared at the February 26 meeting.  Ms. Stipp informed Watson Wyatt that she was "on board" with moving forward with the recommended managers, including Westridge.

V.      **The Westridge Fraud**

In February 2009, the National Futures Association ("NFA") conducted an audit of

Westridge and its affiliated entities.  As a result of the NFA's audit, the Securities and Exchange

Commission ("SEC") and Commodity Futures Trading Commission ("CFTC") filed a complaint

against Westridge alleging securities violations.  Upon the filing of the complaint, Westridge's

assets were frozen and a receiver was appointed by the court.  The receiver conducted a full

forensic accounting of Westridge and its affiliated entities, which revealed "a long history of

WGTC's and WGTI's practice of comingling funds, operating with utter disregard for corporate

governance, and employing fraudulent accounting practices in an apparent attempt to conceal the

true financial condition of the entities from investors, potential investors[.]"

After liquidating the assets of the Westridge entities, the receiver made a series of

distributions to Westridge's investors.  To date, the Acument Plan has received $39,728,133 in

distributions.

## PROCEDURAL HISTORY

On January 20, 2012, Acument and the Acument Pension Plan filed a lawsuit against

Towers Watson & Co. and Towers Watson Investment Services, Inc.  *See* Complaint (Dkt No.

1).  Plaintiffs contend that Watson Wyatt breached its fiduciary duties to the Acument Plan and,

as a result of its breach, the Plan lost millions of dollars.  Compl. ¶ 1.  Plaintiffs' Complaint

contains four counts: (i) failure to exercise diligence and prudence (Count I); (ii) failure to

disclose material information (Count II); (iii) failure to act in accordance with plan documents

(Count III); and (iv) failure to adequately diversify the Plan's assets (Count IV).  *Id.* ¶¶ 56-98.

On March 23, 2012, Defendants filed an Answer denying Plaintiffs' allegations that

Watson Wyatt breached its fiduciary duties or caused any losses to the Plan.  (Dkt. No. 8)

Defendants filed an Amended Answer and Counterclaim on January 16, 2014.  (Dkt. No. 67)

Defendants' Counterclaim alleges that Acument breached its own fiduciary duties to the Plan by, among things, approving an investment without an understanding of its investment strategy, failing to read the term sheet and subscription agreement, and making false representations in those same documents, and therefore, in the event Defendants are found liable, Acument is liable for contribution.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "all of the submissions taken together 'show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Osberg v. Foot Locker, Inc.*, 907 F. Supp. 2d 527, 532 (S.D.N.Y. 2012) (quoting Fed. R. Civ. P. 56(c)), *aff'd in part, vacated in part*, -- F. App'x --, 2014 WL 552784 (2d Cir. Feb. 13, 2014). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In making that determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alterations and internal quotation marks omitted). Only disputes over material facts— i.e., "facts that might affect the outcome of the suit under the governing law"—

will properly preclude the entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).

## ARGUMENT

Summary judgment is appropriate on all four counts in Plaintiffs' Complaint.  Summary

judgment is appropriate on Count I on causation grounds, on Count II on breach and causation,

and on Counts III and IV on breach.

### I.    Watson Wyatt's Alleged Failure To Exercise Diligence and Prudence Did Not Cause the Plan Harm (Count I).[5]

The parties' experts have devoted more than 170 pages in their reports to the question of

whether Watson Wyatt exercised appropriate diligence and prudence in connection with its

research into and recommendation of Westridge.  The disagreement relates primarily to the

standard of care required of an investment advisor like Watson Wyatt in 2008 and before.

Although Defendants maintain that Watson Wyatt's conduct in relation to the Westridge

recommendation exceeded the applicable standard of care, they also recognize that these

differing views cannot be resolved at the summary judgment stage.  But the Court need not

resolve this disagreement: because Westridge's fraud went undetected by its regulators, auditors,

and the investment community for over a decade, and because scores of sophisticated investors,

many at the recommendations of their investment advisors, invested with Westridge during this

period, Westridge was not an *objectively imprudent* investment as a matter of law.  Accordingly,

even if Watson Wyatt had done more, or different, due diligence, it would not have discovered

---

[5] Although Plaintiffs' Count I is titled "Failure to Exercise Diligence and Prudence" and their Count II is titled "Failure to Disclos[e] Material Information," Plaintiffs make allegations relating to Watson Wyatt's due diligence and disclosure practices under both counts.  For the Court's convenience, in this Memorandum, we address all of Plaintiffs' due diligence allegations under the Count I heading and all of their disclosure allegations under the Count II heading.

that Westridge was an imprudent investment.  As a result, Plaintiffs cannot prove causation on

Count I.

### A.    Plaintiffs' Allegations

The Complaint alleges that Watson Wyatt failed to exercise diligence and prudence by:

- failing to conduct adequate due diligence, Compl. ¶¶ 6, 60, 62, 71;

- failing to recognize "red flags" with respect to Westridge, *id.* ¶¶ 60;

- ignoring "serious concerns" or "red flags," including trading violations, self-administration, and the complexity of Westridge's strategy, *id.* ¶¶ 6, 72, 78;

- failing to understand Westridge's investment strategy and how it obtained its results, *id.*  ¶¶ 62, 72; and

- recommending Westridge "'pending' the completion of a proper due diligence investigation," *id.* ¶ 74.

The Complaint further alleges that Watson Wyatt's alleged failure to exercise diligence

and prudence caused the Plan harm because "[a] prudent fiduciary would have known, from both

the available evidence and the additional red flags it would have uncovered, that Westridge was

not a prudent investment," *id.* ¶¶ 60, 61, and "[a]s a result of the above-described conduct, the

Plan and its participants and beneficiaries lost assets," *id.* ¶ 63.

### B.    Plaintiffs Cannot Establish the Element of Causation.

To prevail on Count I, Plaintiffs must prove both that Watson Wyatt failed to exercise

appropriate diligence and prudence and that Watson Wyatt's conduct caused the alleged losses to

the Plan.  *See McCabe v. Capital Mercury Apparel*, 752 F. Supp. 2d 396, 405 (S.D.N.Y. 2010)

("To establish a breach of fiduciary duty under ERISA, a plaintiff must demonstrate some causal

link between the alleged breach of [the fiduciary's] duties and the loss plaintiff seeks to recover."

(alterations in original) (internal quotation marks omitted)); *Silverman v. Mut. Benefit Life Ins.*

*Co.*, 138 F.3d 98, 105 (2d Cir. 1998).  "Because both loss to the fund, and a causal connection

11

between that loss and [a] defendant's breach, are necessary elements of an ERISA claim for damages under 29 U.S.C. § 1109(a), if [a defendant] demonstrates an absence of a genuine issue of material fact as to either causation or loss on [a plaintiff's] ERISA claims, [the defendant] is entitled to summary judgment on those claims." *Bd. of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662, 681-82 (S.D.N.Y. 2011) (alterations in original) (internal quotation marks omitted).

To prevail on the causation element of Count I, Plaintiffs must prove that in light of all the information they allege a prudent diligence process would have yielded, the Westridge recommendation was "objectively imprudent." *See Liss v. Smith*, 991 F. Supp. 278, 297 n.22 (S.D.N.Y. 1998) ("[B]reach alone does not establish liability, as plaintiffs must still establish causation and loss by demonstrating that the investment at issue is objectively imprudent based on what the trustees should have known had they conducted a proper investigation." (citing *Fink v. Nat'l Savings and Trust Co.*, 772 F. 2d 951, 962 (D.C. Cir. 1985) (Scalia, J. concurring in part, dissenting in part)); *United States v. Mason Tenders Dist. Council of Greater N.Y.*, 909 F. Supp. 882, 884 (S.D.N.Y. 1995) ("Having found that a trustee has failed to investigate a particular investment adequately, . . . a court must then examine whether, considering the facts that an adequate and thorough investigation would have revealed, the investment was objectively imprudent."); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994) ("Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.").  The record does not contain genuinely disputed material evidence on which the Court could make this finding.

"In interpreting [the prudent person] standard, courts . . . have looked to the conduct of similarly situated fiduciaries to provide an objective standard of prudence." *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337-Civ.-JORDAN, 2007 WL 2263892, at *46 (S.D. Fla. Aug. 7, 2007); *see also Cobell v. Norton*, 283 F. Supp. 2d 66, 269 (D.D.C. 2003) ("[B]oth the 'prudent investor' and 'prudent man' standards [under ERISA] are workable standards precisely because, under a given set of circumstances, there will be other similarly-situated prudent investors or prudent persons against whose conduct a court may measure a defendant's conduct." *vacated in part on other grounds*, 392 F.3d 461 (D.C. Cir. 2004).

For this reason, courts have concluded that "a hypothetical prudent fiduciary would have made the same investments" in light of evidence that "other well-known pension plans purchased [the investment in question]." *Meinhardt v. Unisys Corp.*, 173 F.3d 145, 154 (3d Cir. 1999).  For example, in *In re Bayou Hedge Fund Litigation*, this Court dismissed the plaintiff's breach of fiduciary duty claim against its investment advisor for allegedly conducting inadequate diligence before recommending an investment that turned out to be a Ponzi scheme in part because the fraud "managed to deceive the entire investing community for nearly a decade."  534 F. Supp. 2d 405, 418 (S.D.N.Y. 2007), *aff'd sub nom.*, *S. Cherry St. LLC v. Hennessee Grp. LLC*, 573 F. 3d 98 (2d Cir. 2009); *see also In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 377 (S.D.N.Y. 2011) (noting that the complaint "contains only the same tired allegations of negligence that can be attributed to the entire securities industry concerning Madoff").  Similarly, in *Kuper v. Quantum Chemicals Corp.*, the court held that "Defendants cannot be said to have been objectively imprudent for having acted in the same manner as impartial observers had recommended."  852 F. Supp. 1389, 1398-99 (S.D. Ohio 1994) (noting that "numerous established and presumably impartial investment advisors [recommended an investment]"), *aff'd*

13

*sub nom.*, *Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995); *see also Tatum v. R.J. Reynolds Tobacco Co.*, 926 F. Supp. 2d 648, 686 (M.D.N.C. 2013) (citing *Kuper*, 852 F. Supp. at 1395).

Accordingly, that Westridge had deceived both the investment community and its numerous regulating bodies for more than a decade warrants summary judgment on Count I. Westridge operated for more than twenty-five years, and during that time, it attracted scores of sophisticated investors; was recommended by well-respected investment advisors; was financed by some of the world's largest financial institutions; and operated a fraud that went undetected by both its own auditors and the regulatory bodies responsible for overseeing those operations. As a result, even if Plaintiffs were ultimately able to prove that Watson Wyatt's due diligence was insufficient, they will not be able to prove that greater due diligence would have caused a different result.

*Investors.*  Westridge managed its investment funds for more than twenty-five years and reported approximately $3.0 billion in assets under management at year-end 2007.  Statement of Undisputed Material Facts ("SUMF") ¶¶ 4(a), 6.  Although the identities of most of those who invested with Westridge during this period of time are not publicly available, the identities of certain investors at the time the fraud was discovered are publicly available.  According to the Westridge receiver's report, at the time the fraud was discovered, Westridge had 15 investors in Fund A, one investor in Fund R, and 24 investors in WGTI and WGTC.  *Id.* ¶ 16.  The investors in Fund A—the vehicle in which Acument was invested—included:

- Wells Fargo
- University of Tennessee
- Laird Norton
- Fraser Papers
- Knight Ridder
- Cabora Investment
- The Frist Foundation
- The HCA Foundation

- Ohio Northern University
- HEB Grocery Co.
- The Timken Co.
- Houston Municipal
- Oklahoma State University
- Carnegie Mellon University

*Id.* ¶ 17.  Other notable investors include:

- CBS Corp.
- Blue Cross & Blue Shield
- 3M
- Viacom Inc.
- The McClatchy Co.
- Alexander Dawson Foundation
- Iowa Public Employees' System
- Kaiser Aluminum & Chemical
- North Dakota State Investment Board
- San Diego County Employees Retirement Association
- Sacramento County Employees' Retirement System
- University of Pittsburgh
- Bowling Green State University
- Pennsylvania Public School Employees' Retirement System
- Kern County Employees' Retirement Association

*Id.* ¶¶ 26-30.

*Investment Advisors.*  Certain Westridge investors were acting on the advice of investment advisors like Watson Wyatt.  Although little information is publicly available about the investment advisors who recommended Westridge, notable exceptions include three of Watson Wyatt's competitors—i.e., Mercer Investment Consulting, Cambridge Associates, and Wilshire Associates—all of which reportedly provided "glowing reports" of Westridge.  *Id.* ¶¶ 18-21.  For example, Mercer recommended Westridge to the Sacramento County Employees' Retirement System ("SCERS").  *Id.* ¶¶ 19, 20.  According to a letter from SCERS to its plan participants, its "outside investment consultant performed a thorough review of Westridge and WG Trading and rated them highly."  *Id.* ¶ 19.  The letter further notes that (i) "Westridge and WGTC had been providing the investment product in the case at hand to institutional investors

15

like SCERS since 1996"; (ii) "[t]he firms had a number of investors like SCERS, including other public retirement systems, who were happy with the performance of the firms"; (iii) "Westridge and WG Trading had been subject to SEC and CFTC audits, review and oversight since 1996 with no indication of any problems"; (iv) "[a] nationally recognized accounting firm had conducted annual audits of WG Trading and had noted no problems." *Id.*  Similarly, Wilshire recommended Westridge to Iowa Public Employees' Retirement Systems. *Id.* ¶ 18.  In its October 30, 2008 Manager Research Report, Wilshire stated that Westridge "offers an excellent enhanced index strategy which is unique among other enhanced index products . . . .  Wilshire highly recommends this product to clients . . . ." *Id.* ¶¶ 18, 21.

That Hewitt Investment Group assigned Westridge a "neutral" rating in 2007 does not undermine the undisputed facts discussed above. *Id.* ¶¶ 22, 23.  Although it appears that Hewitt did identify risk-control concerns with Westridge,[6] it ultimately rated Westridge "neutral" based on the meagerness of its returns, not a perceived potential of fraud. *Id.*  Regardless, it is unsurprising that views on Westridge in the investment community were not uniformly positive, as they are not for any investment manager.  Evidence that "independent, professional observers" of investment managers reached different conclusions regarding Westridge "underscores the fact that circumstances then existing would not have compelled reasonable persons to a singular conclusion about [Westridge's] future prospects." *Kuper*, 852 F. Supp. at 1397-98.  Indeed, Plaintiffs' expert Mr. Lundelius conceded that it is not his opinion that Hewitt's conduct,

---

[6] The record is devoid of any context regarding Hewitt's assessment of Westridge, including the nature of its due diligence and the source of the information that led to its "neutral" rating.

16

whatever it might have been, established the custom and practice for the entire industry.[7]  SUMF ¶ 24.

*Financial Institutions.*  Westridge received financing and custodial support from some of the world's largest financial institutions, including J.P. Morgan Clearing Corp., Merrill Lynch, Pierce, Fenner & Smith Inc., and Goldman Sachs Execution & Clearing, L.P.  *Id.* ¶ 31. Westridge further reported that it received financing from Credit Suisse, ABN Amro, and Bear Stearns.  *Id.* ¶ 32.

*Regulatory Oversight.*  As a registered investment advisor under the Investment Advisors Act, Westridge Capital Management was regulated by the SEC.  *Id.* ¶¶ 4(b), 4(c), 33, 36, 120. WGTC, Westridge's affiliated broker-dealer, was regulated by the SEC, the Department of Labor ("DOL"), the Financial Industry Regulatory Authority ("FINRA"), the National Futures Association ("NFA"), the U.S. Commodity Futures Trading Commission ("CFTC"), the National Association of Securities Dealers ("NASD"), and the New York Stock Exchange.  *Id.* ¶¶ 4(c), 4(d), 19, 34-36, 119, 120.  Although an NFA audit ultimately uncovered the fraud, *id.* ¶ 119, it is notable that it did not do so until 2009—more than ten years after the fraud began—and that none of the other oversight bodies—many of which had far more power and authority to probe Westridge's financial records than any of the investment advisors—had detected it.

*Auditors.*  Westridge Fund A's financial statements were audited by BDO Binder Limited, the fifth-largest accounting network in the world.  *Id.* ¶¶ 37, 38.  WGTC's financial

---

[7] Mr. Lundelius states in his expert report that "Acument invested in Westridge by acquiring shares of Fund A and 80% of Fund A's assets were invested in uncollateralized structured notes issued by WGTI, an unregulated, unaudited entity, which is unequivocally imprudent."  SUMF ¶ 25.  Mr. Lundelius's *ipse dixit* statement regarding the propriety of investing in Westridge in 2008, made with the benefit of hindsight, cannot be reconciled with the undisputed evidence that demonstrates that the investment community as a whole did not consider Westridge to be an imprudent investment in 2008.

statements were audited by Deloitte & Touche LLP.  *Id.* ¶ 39.  Both Westridge entities received

clean audits in 2007.  *Id.* ¶¶ 37, 39.

      *Third-Party Performance Verifier.*  In May 2008, Ashland Partners & Company LLP

verified the compliance of Westridge, from April 1, 1996 through March 31, 2008, with the

requirements of the Global Investment Performance Standards ("GIPS").  It concluded that

Westridge's processes and procedures were designed to calculate and present performance

results in compliance with the GIPS standards and that Westridge's reported performance

complied with the calculation requirements of the GIPS standards.  *Id.* ¶ 40.

      For all these reasons, even in light of all the information that (Plaintiffs allege) a prudent

diligence process would have yielded, the Westridge recommendation would not have been

objectively imprudent.  Accordingly, Plaintiffs cannot prove the necessary element of causation

in support of Count I.

## II.   Defendants Did Not Provide Materially Misleading Information, and Any Alleged Failure To Disclose Information Was Not the Actual or Proximate Cause of Harm To the Plan (Count II).

      In Count II of their Complaint, Plaintiffs allege that Watson Wyatt breached its duty of

loyalty by failing to disclose information about Westridge's investment strategy, Watson Wyatt's

due diligence into Westridge, and supposed "serious concerns" Watson Wyatt had regarding

Westridge.  Compl. ¶¶ 66-81.  Plaintiffs cannot prove Count II for three independent reasons: (i)

ERISA's duty of loyalty, at most, prohibits Watson Wyatt from intentionally providing

materially misleading information, and Plaintiffs have not alleged that Watson Wyatt

intentionally provided materially misleading information; (ii) the uncontested record shows that

Watson Wyatt in fact disclosed substantial information about Westridge and that it had no

"serious concerns" regarding Westridge; and (iii) the uncontested record shows that any alleged

failures to disclose information were neither the "but for" nor the proximate cause of any losses

to the Plan.  Accordingly, summary judgment is appropriate on Count II.

### A.    Plaintiffs' Allegations

Plaintiffs allege that Watson Wyatt failed to disclose material information by failing to do

the following:

- describe the investment to the Investment Committee, including its "highly leveraged nature," and use of derivatives, Compl. ¶¶ 9, 51, 62;

- disclose that it did not understand Westridge, *id.* ¶ 69;

- disclose its own concerns about Westridge, including that: Westridge's principals had minor trading violations; its strategy was difficult to explain; it was "self-administered"; it had "governance issues"; it had issues relating to "portfolio transparency" and "variation margin"; and other "serious concerns," "red flags," and "significant risks" it had uncovered, *id.* ¶¶ 6, 51, 52, 62, 70, 71, 73, 77; and

- disclose that its due diligence into Westridge was not complete or "conditional," *id.* ¶¶ 6, 45, 48, 49, 74-76.

The Complaint further alleges that Watson Wyatt's alleged failure to disclose material

information caused the Plan harm in the following respect:  If Watson Wyatt had disclosed its so-

called "serious concerns" and "red flags," Acument would not have approved the Westridge

investment, and therefore, the Plan would not have suffered losses.  *Id.* ¶¶ 9, 54, 55, 78, 79.

### B.    Plaintiffs Cannot Establish the Element of Breach.

#### 1.    ERISA's Duty of Loyalty, at Most, Prohibits Watson Wyatt from Intentionally Providing Materially Misleading Information.

As fiduciaries to the Acument Pension Plan, both Watson Wyatt and Acument owed

duties to the Plan, not to one another.  *See* 29 U.S.C. § 1104(a)(1) (stating that "a fiduciary shall

discharge his duties *with respect to a plan* solely in the interest of the participants and

beneficiaries" (emphasis added)).  Accordingly, to the extent ERISA imposed onto Watson

Wyatt a disclosure obligation, it is derived from Watson Wyatt's general duty of loyalty *to the*

19

*Plan*, not from specific disclosure obligations it owed directly to Acument.  Case law regarding disclosure obligations a fiduciary owes to plan beneficiaries and participants might, however, establish an upper limit on any disclosure obligations Watson Wyatt owed Acument.  Those disclosure obligations are discussed below.

Although "ERISA contains a 'comprehensive set of reporting and disclosure requirements,'" *Gray v. Citigroup Inc.*, 662 F.3d 128, 142-43 (2d Cir. 2011), none of those requirements applies to Watson Wyatt, and Plaintiffs have not suggested otherwise.[8]  Compl. ¶ 67 (citing ERISA's duty of loyalty as the basis for the claim in Count II).  The Second Circuit has repeatedly cautioned against "infer[ing] an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure."  *Bd. of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 147 (2d Cir. 1997); *Gray*, 662 F.3d 142-43 (rejecting argument that ERISA's general duty of loyalty required a fiduciary to provide beneficiaries information about a particular investment).

At most, courts have "interpreted the scope of ERISA fiduciary duties to include a duty to avoid *intentional material misrepresentations*."  *Bell v. Pfizer, Inc.*, 626 F.3d 66, 74 (2d Cir. 2010) (emphasis added); *see also In re Am. Express Co. ERISA Litig.*, 762 F. Supp. 2d 614, 629 (S.D.N.Y. 2010) ("Even if the disclosure requirements of ERISA go beyond the specific requirements of sections 1021-31, the requirement is no more than a duty to refrain from making affirmative misrepresentations to plan participants."); *Fisher v. JP Morgan Chase & Co.*, 703 F. Supp. 2d 374, 386 (S.D.N.Y. 2010) ("[T]he caselaw is clear that *if* an ERISA fiduciary

---

[8] ERISA's disclosure requirements require that plan administrators—such as Acument—inform plan participants about the importance of portfolio diversity, among other things.  *See In re Citigroup*, 662 F.3d at 142.  Because Watson Wyatt was not a plan administrator, these provisions do not apply.  *See Krauss v. Oxford Health Plans, Inc.*, 418 F. Supp. 2d 416, 434 (S.D.N.Y. 2005) ("Defendant is clearly an ERISA fiduciary.  However, not all fiduciaries are subject to disclosure requirements under § 1132(c); only plan administrators are."), *aff'd*, 517 F.3d 614 (2d Cir. 2008).

communicates information to plan participants, the fiduciary must be truthful."); *Bd. of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662, 681-82 (S.D.N.Y. 2011) ("[A]n ERISA fiduciary [also] has both a duty not to make misrepresentations to plan participants, and an affirmative duty to inform when the [fiduciary] knows that silence might be harmful." (alterations in original) (internal quotation marks omitted)).

Plaintiffs have not alleged in their Complaint that Watson Wyatt's disclosures to Acument were *intentionally materially misleading*; nor is there factual support in the record for such an allegation.

### 2. Watson Wyatt Disclosed Substantial Information About Westridge's Structure and Strategy To Acument.

Regardless of the legal standard, Plaintiffs' allegation that Watson Wyatt failed to adequately describe the Westridge investment is contradicted by the undisputed facts. Plaintiffs' allegations appear to be rooted in the mistaken belief that the only information provided to Acument was the information contained in the bullet points of a February 26, 2008 presentation. In fact, Watson Wyatt provided substantially more information, both at the February 26 meeting and prior to the actual investment, which occurred more than four months after the February 26 meeting. SUMF ¶¶ 67, 72, 73, 81, 87-89. Moreover, Acument employees have testified that they were comfortable with the amount of information presented in the February 26 presentation. *Id.* ¶¶ 69, 70.

*February 26, 2008 Meeting.* Watson Wyatt's investment consultants, Ms. Woida and Mr. Hemmer, first presented the Westridge recommendation to two members of Acument's Investment Committee, Messrs. Talos and Clark, on February 26, 2008. *Id.* ¶ 66. The written

presentation,[9] which served as the basis for Watson Wyatt's discussion of the recommended managers, states that Westridge's strategy involved (i) an "[e]nhanced index approach that attempts to add incremental value over benchmark on a consistent basis with the same risk as the S&P 500 Index"; (ii) that the "[v]alue added comes from an index arbitrage strategy that exploits the pricing inefficiency of S&P 500 Futures contracts versus the cash market"; and (iii) that "[t]he risk of underperforming the benchmark is minimized because the process does not rely on active stock picking, market timing, credit/duration exposure, investment style bias or portfolio/sector weightings." *Id.* ¶¶ 68, 72.  The written presentation further includes information about Westridge's history and personnel, including its 25 years in operation, its sophisticated investor base, and its history of consistent outperformance relative to its benchmark.[10]  *Id.* ¶ 68.

Messrs. Talos and Clark both testified that they did not expect to receive more information about the recommended managers than what Watson Wyatt provided in this presentation.  *Id.* ¶¶ 69, 70.  As Mr. Talos, the chair of the investment committee, explained when asked whether he expected to receive more information about the managers than what was in the presentation: "No, I mean, because . . . we were working based on [Watson Wyatt's] recommendation, and they had already determined that these people were somebody we should invest in."  *Id.* ¶ 69.  Mr. Clark echoed this sentiment, noting that he did not expect more than

---

[9] Ms. Woida and Mr. Hemmer provided information about Westridge beyond what was contained in the presentation's bullet points.  *Id.* ¶¶ 72-74.  Although the parties dispute whether particular facts were orally disclosed, there is no dispute that Watson Wyatt's presentation of Westridge was not confined to the written bullet points in this presentation.

[10] On March 13, Mr. Hemmer met with Ms. Stipp, one of the two members of Acument's Investment Committee who did not attend the February 26 meeting, to review the information shared at the February 26 meeting.  SUMF ¶¶ 81, 82.

two pages of information on each manager "because I'm assuming [Watson Wyatt] had done their homework."  *Id.* ¶ 70.

*Execution Documents.*  On June 5, 2008, nearly one month before the Plan invested with Westridge, Ms. Woida sent Mr. Clark, Acument's general counsel and a member of its Investment Committee, a copy of the subscription materials for the Westridge investment, including the investment's subscription agreement and term sheet, and a letter of direction that would authorize the Plan's Trustee to make the investment.  *Id.* ¶ 87.  Ms. Woida informed Mr. Clark that the Westridge investment vehicle is a limited partnership and therefore required that the Acument's Plan Trustee—State Street—make the investment.  *Id.*  She explained that two of the documents required Acument's signature and the other documents were for informational purposes.  *Id.*  Finally, she informed Mr. Clark that "[n]ormally, [Watson Wyatt's] clients have their ERISA counsel review the documents prior to investment."  *Id.*

On June 6, Ms. Woida sent an email to all three members of the Investment Committee— Mr. Talos, Mr. Clark, and Ms. Stipp—in which she explained that "[e]arlier this week [she] forwarded the documents for the Westridge large cap mandate *for review* and execution."[11]  *Id.* ¶ 91 (emphasis added).  Mr. Clark coordinated the review of the subscription documents, which included obtaining a review by O'Melveny & Myers, Acument's ERISA counsel.  *Id.* ¶¶ 96, 97.

Westridge's term sheet is a three-page summary of Westridge's strategy and structure. *Id.* ¶ 88.  The first page of the term sheet contains a one-paragraph description of Westridge's investment process, which includes the following information:

- Westridge will establish an initial position in the S&P 500 Futures to gain index exposure;

---

[11] Mr. Gray was no longer on the Investment Committee at this time.  SUMF ¶ 59.  Although he was replaced by Mr. Dauch as CEO on or about June 2, 2008, Mr. Dauch was not introduced to the Acument Pension Plan until July 2008.  *Id.* ¶ 60.

- it will "manage the rolling forward" of these contracts to maintain constant index exposure;

- the S&P 500 Futures component of the strategy will require about 10-15% of the Fund's assets; and

- the remaining 85 to 90% of the assets will be available for "enhancement" and will be invested in "structured notes issued by WG Trading Investors, L.P. (the 'Intermediary') which bear interest at a rate determined by reference to the positive investment return of a limited partnership interest of WG Trading Company, L.P. (the 'Trading Company') to achieve a return based on a Stock Index Arbitrage strategy – long index and short futures of same index."

*Id.* ¶ 88(b). The next section of the term sheet is a two-paragraph "Background" section that explains how futures contracts and index arbitrage work. *Id.* ¶ 88(c). The term sheet further explains, among other things, that (i) the administrator of the Fund is Folio Administrators Limited, (ii) the custodians are Merrill Lynch and Morgan Stanley, (iii) the auditor is BDO British Virgin Islands; and (iv) the Fund's strategy involves the use of leverage. *Id.* ¶ 88 (d)-(h).

The subscription agreement provides information similar to what is contained in the term sheet, including that Westridge's strategy involved structured notes and leverage. *Id.* ¶¶ 89, 90. The subscription agreement further provides a series of representations and warranties, certain of which required the signature of a representative of the named fiduciary, i.e., Acument. *Id.* ¶ 90. One of the representations and warranties that required the signature of Acument's representative states as follows:

> the undersigned has *reviewed, understands and has evaluated the investment objectives and strategy of the Fund* and has determined that an investment in the Fund is *consistent with the objectives of the Plan* and the Fund's intended investments will, when coupled with the Plan's other investments, *satisfy the ERISA diversification requirements* as to the Plan.

*Id.* ¶ 90(b) (emphases added). Mr. Talos, the chair of Acument's Investment Committee, signed this representation and warranty. *Id.* ¶ 98.

Accordingly, Plaintiffs' contention that Watson Wyatt failed to adequately describe the investment, including its use of leverage and derivatives, *see* Compl. ¶¶ 9, 51, 62, is contradicted by the undisputed record. *Cf. In re Citigroup*, 662 F.3d at 142 (finding that the plaintiffs would not be able to support a failure to disclose claim because the required information was disclosed in the "Plan documents"), *cert denied*, 133 S. Ct. 475 (2012).

### 3. Plaintiffs Are Estopped from Disavowing Acument's Representations and Warranties in the Execution Documents.

Plaintiffs cannot dismiss the significance of the disclosures in the execution documents by claiming that Acument neither reviewed nor understood their contents. Acument (through the chair of its Investment Committee) represented in writing that it had "reviewed, understands and has evaluated the investment objectives and strategy of the Fund," SUMF ¶¶ 90(b), 98, and it should therefore be equitably estopped from taking a contrary position in this litigation.

"The doctrine of equitable estoppel is a judicial doctrine of equity which operates apart from any underlying statutory scheme." *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 724 (2d Cir. 2001). It is "defined as a bar which precludes a person from questioning a fact which he has by his conduct induced another person to believe and to act on to his prejudice." *Aetna Cas. & Sur. Co. v. Aniero Concrete, Co.*, 404 F.3d 566, 608 (2d Cir. 2005) (internal quotation marks omitted). "Because this is an equitable estoppel claim under a federal statute, federal law principles of equitable estoppel are applicable." *Kosakow*, 274 F.3d at 725. "Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to [its] detriment." *Id.* (citing cases). "[E]stoppel is appropriate even where 'the one making the representation believes

that his statement is true[.]'"  *Id.* at 726 (quoting Restatement (Second) of Torts, § 894(1), cmt. b).

The undisputed record supports each of these elements.  First, Mr. Talos's representations in the execution documents were false.  Mr. Talos represented in the subscription agreement, on behalf of Acument, that he "has reviewed, understands and has evaluated the investment objectives and strategy of the Fund and has determined that an investment in the Fund is consistent with the objectives of the Plan."  SUMF ¶¶ 90(b), 98.  This representation cannot be reconciled with Mr. Talos's sworn deposition testimony that he did not review the execution documents and did not even attempt to understand Westridge's strategy:

> Q.    Okay.  And 7k, little three, says: The undersigned, which is you, has reviewed, understands, and evaluated the investment objectives and the strategy of the fund.  So my question is, with regard to that representation, is there anything untruthful or inaccurate?
>
> A.    I did not understand it.  I do not have the expertise to understand that. And to understand the ramification of this.  That's why we would have had it reviewed.  If I was told that it was okay to sign, then I would have signed it.
>
> . . . .
>
> Q.    Okay. And in signing that subscription agreement, did you read the term sheet that's referenced there?
>
> A.    No, I probably didn't.  I had somebody reviewing, telling me it was okay to sign off on it.

*Id.* ¶¶ 99, 100.  As Mr. Talos further explained when asked whether he was comfortable with Westridge's investment strategy:  "The mechanics of it, of how they invested the money, we didn't know; we didn't care about.  We didn't evaluate that.  We paid Watson Wyatt a quarter of a million dollars a year to do that."  *Id.* ¶ 102.

In addition, Mr. Talos represented and warranted in the letter directing its trustee (State Street) to make the investment in Westridge that he "personally and as Trustee for the benefit of

26

the Trust," had determined that "upon the advice of legal counsel, where deemed appropriate by the undersigned, and to the best knowledge of the undersigned *after due investigation and inquiry* . . . all statements of fact, representations and warranties contained in the Execution Documents on behalf of the Trust or by you individually or as Trustee are true and accurate." *Id.* ¶ 105 (emphasis added). "Statements of fact, representations and warranties" in the subscription agreement include the following:

- the investment strategies of the Fund involve *the use of leverage* which could have the effect of increasing losses otherwise sustained by the Fund;

- WG Trading Investors, L.P., the issuer of *structured notes* to be purchased by the Fund, and WG Trading Company, L.P., the performance of the limited partnership interests of which serves as the index for interest payable on the structured notes, are each controlled by affiliates of Westridge Capital Management, Inc., the investment adviser of the Fund; and

- the *governing documents of the Plan permit* the Plan to invest in the Company and to invest, directly or indirectly through the Fund, in the assets in which the Fund intends to invest, as indicated in the Term Sheet.

*Id.*¶ 90(a) (emphasis added). Mr. Talos understood his representation to mean no more than that "legal counsel would have reviewed this . . . [a]nd this was deemed okay for me to sign." *Id.* ¶ 106. Because Mr. Talos did not conduct an "investigation and inquiry" to ensure the accuracy of these representations, his statement in the execution documents was false.

Second, Acument knew, or should have known, that Watson Wyatt would rely on its representations. In Ms. Woida's email of June 5, in which she sent Mr. Clark the execution documents, she stated: "Please let me know if I can be of assistance in the review process." *Id.* ¶ 87. On June 10, Ms. Woida sent another email to Mr. Clark in which she stated: "Is there any thing I can do to assist with the Blackrock, AllianceBernstein and Westridge documents?" *Id.* ¶ 92. Ms. Woida expected that Acument would review the execution documents, ask questions, and bring to her attention any concerns it had. *Id.* ¶¶ 67, 79. By falsely representing that it had

27

reviewed, understood, and was comfortable with Westridge's investment strategy, Acument deprived Watson Wyatt of the opportunity to clarify any questions Acument had or address any concerns it might have had.

Finally, Watson Wyatt relied on Acument's representations to its detriment.  Ms. Woida did not know that Mr. Talos's representations were false.  *Id.* ¶ 93.  Had she known that Acument had not reviewed and understood Westridge's investment strategy, or that it was not comfortable with that strategy, she would have answered Acument's questions and addressed its concerns. *Id.* ¶¶ 79, 94.  If after answering Acument's questions and addressing its concerns, Acument had reservations about Westridge, she would have requested that Watson Wyatt's U.S. Equities ASK team recommend a different manager.  *Id.* ¶ 95.  Ms. Woida accordingly relied on Acument's representations, and as a result of that reliance, was deprived of the opportunity to address any of Acument's alleged confusion or concerns prior to making the investment.

Moreover, courts have routinely used the doctrine of equitable estoppel to prevent an investor from disavowing representations it made in subscription agreements.  For example, in *Goodwin Properties, LLC v. Acadia Group, Inc.*, No. 01-49-P-C, 2001 WL 800064 (D. Me. July 17, 2001), the defendants argued that "the plaintiffs represented in writing at the time of the sale that they were accredited investors and may not now rely on the allegations in their complaint that they were not."  *Id.* at *7.  The court agreed, holding that the plaintiffs "cannot now disavow those representations in order to support their claims against the defendants."  *Id.* (citing *Wright v. Nat'l Warranty Co.*, 953 F.2d 256, 260 (6th Cir. 1992); *Noz v. Value Investing Partners, Inc.*, No . 98 Civ. 6977 (RO), 1999 WL 387400 (S.D.N.Y. June 14, 1999)); *see also Supernova Sys., Inc. v. Great Am. Broadband, Inc.*, No. 1:10-cv-319, 2012 WL 425552, at *5 (N.D. Ind. Feb. 9, 2012) (reviewing cases and concluding that the "weight of authority" suggests that the plaintiff

"cannot now disavow [its] representations in order to support its claims against the Defendants" (alterations and internal quotation marks omitted) (citing cases)); *Porter v. Shearson Lehman Bros. Inc.*, 802 F. Supp. 41, 63-64 (S.D. Tex. 1992) (holding that because "[e]ach investor warranted meeting minimum qualification criteria," the plaintiff "is estopped from asserting that he did not meet the suitability standards"); *Rissman v. Rissman,* 213 F.3d 381, 383 (7th Cir. 2000) ("Securities law does not permit a party to a stock transaction to disavow such representations—to say, in effect, 'I lied when I told you I wasn't relying on your prior statements' and then to seek damages for their contents."). For all these reasons, Plaintiffs should be equitably estopped from disavowing the representations Acument made in the execution documents.

### 4.  Plaintiffs' Remaining Allegations Are Based on Incorrect Factual Premises.

#### a.  Watson Wyatt Understood Westridge's Investment Strategy

Plaintiffs contend that Watson Wyatt "failed to understand the Westridge investment strategy" and that it should have disclosed this fact. Compl. ¶ 69. The undisputed evidence shows that the relevant Watson Wyatt employees did, in fact, understand Westridge's investment strategy. Mr. Nipp, the ASK employee primarily responsible for researching Westridge, understood Westridge's investment strategy.[12] SUMF ¶ 9. And Mr. Hemmer and Ms. Woida, the client consultants on the Acument account, also understood Westridge's investment strategy. *Id.* ¶¶ 83-86. Accordingly, there was nothing to disclose.

---

[12] Mr. Gold, who attended the February 27, 2008 meeting with Westridge, also understood Westridge's investment strategy. SUMF ¶ 10.

> **b.     Watson Wyatt Did Not Have "Serious Concerns" Regarding Westridge**

Plaintiffs further contend that Watson Wyatt had identified "red flags," "serious concerns," or "significant risks" associated with Westridge that they should have disclosed. Compl. ¶¶ 6, 51, 52, 62, 70, 71, 73, 77.  These allegations uniformly take comments in Watson Wyatt's internal research notes out of context.[13]  Watson Wyatt had assigned Westridge its highest FREX rating for nearly a decade.  SUMF ¶ 41.  As the Watson Wyatt employees who *authored* the comments on which Plaintiffs focus have explained, these comments did not, in fact, represent "serious concerns."  *Id.* ¶¶ 8, 11-15, 61.

That is not to say that Westridge did not have strengths *and* weaknesses: every manager in Watson Wyatt's files was listed as having "strengths" and "weaknesses."  *Id.* ¶ 3.  Watson Wyatt did not share its internal research notes with AIS clients absent a specific request, *id.* ¶¶ 1, 2, however, and because Acument did not request these notes, Watson Wyatt did not share its lists of "strengths" and "weaknesses" for *any* of the managers it recommended to Acument.  *Id.* ¶¶ 69, 70.  Indeed, according to Mr. Paige, Acument's CEO, Acument expected Watson Wyatt only to communicate *unreasonable* manager-related risks.  *Id.* ¶ 71.  Plaintiffs cannot reasonably contend that they were therefore misled into believing that *none* of the managers Watson Wyatt recommended (including Westridge) had *any* weaknesses.[14]  *Cf. In re Beacon Assocs. Litig.*, 745

---

[13] As explained above, the Complaint identifies comments in Watson Wyatt's internal research notes for Westridge regarding "minor trading violations," "governance," "self-administration," "portfolio transparency," and "variation margin."  *See supra* Part II.A.

[14] As explained above, Mr. Talos testified that he did not expect to receive more information about the managers than what was in the presentation "because . . . we were working based on [Watson Wyatt's] recommendation, and they had already determined that these people were somebody we should invest in." SUMF ¶ 69.  Mr. Clark similarly testified that he did not expect more than two pages of information on each manager "because I'm assuming [Watson Wyatt] had done their homework."  *Id.* ¶ 70.

F. Supp. 2d 386, at 427 (S.D.N.Y. 2010) (noting that an investment advisor "need not disclose its internal deliberations" (internal quotation marks omitted)).

<strong>c.      Watson Wyatt's Due Diligence on Westridge Was Not "Incomplete."</strong>

Plaintiffs contend that Watson Wyatt's due diligence into Westridge was incomplete and that its recommendation was merely "conditional," and therefore, its failure to disclose these facts constituted a violation of its duty of loyalty. Compl. ¶¶ 6, 45, 48, 49, 74-76. Plaintiffs' contention is presumably a reference to an email exchange between Messrs. Nipp and Hemmer in late January 2008. Because it had been several years since Watson Wyatt had visited Westridge's trading facilities, Mr. Nipp and his colleagues arranged for an on-site visit on February 27, 2008. SUMF ¶¶ 7, 62. In a January 31 email exchange with Mr. Nipp, Mr. Hemmer explained that the client consultants would be meeting with Acument before February 27 and suggested that ASK make a "formal recommendation pending a favorable outcome on the 27th." *Id.* ¶ 63. Mr. Nipp responded that a "'pending' recommendation sounds fine." *Id.* ¶ 64.

Plaintiffs' suggestion that Watson Wyatt breached its duty of loyalty by failing to disclose that its recommendation of Westridge was "conditional" or "pending" is misguided for three reasons. *First*, Watson Wyatt disclosed the fact of the February 27th meeting with Westridge and explained to Acument that if the firm's view of Westridge changed as a result of that meeting, it would recommend a different manager. [15] *Id.* ¶¶ 75, 76. *Second*, the meeting in

---

[15] Although the members of Acument's Investment Committee who attended this meeting do not recall this disclosure, SUMF ¶¶ 77, 78, a lack of recollection does not create a contested issue of fact. *See FDIC v. Nat'l Union Fire Ins. Co.*, 205 F.3d 66, 71 (2d Cir. 2000) ("[Witness's] unsubstantiated, self-serving testimony that he does not 'recall' whether or not he was ever informed of Diesenhouse's wrongdoing does not place this issue in genuine dispute."); *Federal Election Comm'n v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002) ( [F]ailure to remember and lack of knowledge are not sufficient to create a genuine dispute."); *I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 182 F.3d 51, 55 (1st Cir. 1999) ("[T]he mere possibility that a factual dispute may exist [premised on one witness's inability to recall the event in question], without more, is an insufficient basis on which to justify denial of a motion for

31

fact did *not* change Watson Wyatt's view of Westridge.  *Id.* ¶ 80.  *And finally*, Acument did not

sign the subscription agreement with Westridge and make the actual investment for more than

four months after the February 27th meeting.[16]  *Id.* ¶¶ 98, 105.

### C.   Plaintiffs Cannot Establish that Any Alleged Failure To Disclose Material Information Was the Actual or Proximate Cause of Harm To The Plan.

#### 1.   Even If Watson Wyatt Had Provided More Information About Westridge, Acument Would Not Have Rejected the Recommendation.

Plaintiffs' "but for" causation allegation is that if Watson Wyatt had disclosed more

information about Westridge and its due diligence into Westridge, Acument would have rejected

Watson Wyatt's recommendation of Westridge at the February 26 meeting.  Compl. ¶¶ 9, 54, 55,

78, 79.  This argument is contradicted by the undisputed testimony of the members of Acument's

Investment Committee who attended the February 26 meeting.[17]

Regarding Plaintiffs' allegation that Watson Wyatt failed to disclose the "conditional"

nature of its recommendation or the fact that its due diligence was incomplete, the causation

inquiry is straightforward:  Even accepting Plaintiffs' contentions that (i) Mr. Nipp's reference to

a "pending" recommendation should have been disclosed to Acument and (ii) Ms. Woida and

Mr. Hemmer's undisputed testimony that they disclosed the fact of the February 27th meeting

---

summary judgment." (internal quotation marks omitted)); *Boehner v. McDermott*, 332 F. Supp. 2d 149, 168 (D.D.C. 2004) ("Defendants' repeated reliance on faulty memory in the face of direct contrary evidence fails to create a genuine issue of material fact.") .

[16] Plaintiffs' allegation appears to be premised on the idea that Acument made an irrevocable decision to invest in Westridge on February 26, 2008.  The record evidence does not support this idea.  As Mr. Hemmer testified, there was not "anything magical about the meeting on the 26th.  The assets weren't going to be invested with this manager [until] months from that date."  SUMF ¶ 65.  Indeed, Watson Wyatt did not present the recommended managers to Ms. Stipp, one of four members of the Investment Committee, until March 13, *two weeks after its February 27 meeting with Westridge. Id.* ¶ 81.

[17] As discussed above, Plaintiffs' allegations regarding (i) "red flags" and "serious concerns" and (ii) Watson Wyatt's purported failure to understand Westridge's investment strategy are based on false premises.  Because the undisputed evidence shows that Watson Wyatt had no "serious concerns" regarding Westridge and because it understood Westridge's investment strategy, there was nothing to disclose.  Accordingly, these allegations are not discussed in this section.

was an insufficient disclosure, the undisputed evidence shows that Watson Wyatt's view of Westridge remained unchanged as a result of the February 27th meeting.  SUMF ¶ 80. Accordingly, any failure to disclose this information was inconsequential.

Plaintiffs' contention that Acument would have rejected the Westridge recommendation if it had been provided more information at the February 26 meeting about Westridge's investment strategy is contradicted by the record evidence.  *First*, the very information Plaintiffs contend should have been disclosed at that meeting was, in fact, disclosed to Acument in the execution documents nearly one month before the investment was made.  *Id.* ¶¶ 88, 89.  If Acument was not troubled by Westridge's investment strategy, as explained in its term sheet and subscription agreement, it would not have been troubled by the same information provided at the February 26 meeting.

*Second*, Mr. Talos, the chair of Acument's Investment Committee, testified that the information about Westridge's investment strategy contained in the term sheet was not information he needed to know.  *Id.* ¶¶ 101, 102, 107, 108.  He further testified that he did not care about the mechanics of the Westridge investment.  *Id.* ¶ 102.  The most he could say regarding under what circumstances he would have rejected the Westridge recommendation is that, "[i]n retrospect, we wouldn't have invested in this if we knew it was going to come out this way."  *Id.* ¶ 103.  When asked what he would have done if he did not like a manager that Watson Wyatt recommended, Mr. Talos responded:  "I don't know that we would have had a basis to say anything.  I don't know what we would have done."  *Id.* ¶ 109.

Mr. Clark was similarly unable to identify a single fact that would have led him to reject the Westridge recommendation other than that if he had been told Westridge was a Ponzi scheme.  *Id.* ¶ 110.  Indeed, he rejected the question as "completely hypothetical."  *Id.*  The most

he could say in this regard is that he would have rejected the Westridge recommendation if he had been aware of the "totality of the circumstances."  *Id.*

*Third*, more information about Westridge was provided to Acument prior to the revelation of the fraud and that information did not cause Acument any concerns.  Thomas McHugh, Acument's controller and a regular attendee of Investment Committee meetings, had conversations with Ms. Woida about the Westridge Investment in November and December 2008.  *Id.* ¶¶ 111-13, 116.  As part of an email exchange, Ms. Woida sent Mr. McHugh a presentation on Westridge's investment strategy, the 2007 audited financial statements for Westridge Fund A and WGTC, and information on Westridge's underlying assets.  *Id.* ¶¶ 112-15.  Mr. McHugh testified that he was aware at this time that WGTC and Westridge Fund A were affiliated entities and that WGTC passed the proceeds of its index arbitrage strategy to Fund A through notes receivable.  *Id.* ¶¶ 115, 116.  Mr. McHugh further testified that he did not believe the use of notes receivable in this manner made Westridge a "riskier" or "inappropriate" investment.  *Id.* ¶¶ 117, 118.

For all these reasons, the undisputed evidence shows that even if Watson Wyatt had provided Acument more information about Westridge and its due diligence process than Plaintiffs allege was provided, Acument would not have rejected the Westridge recommendation.  Accordingly, Plaintiffs cannot establish "but for" causation on Count II.

> **2.   Even If Acument Would Have Rejected the Recommendation If Certain Alleged Risks Had Been Disclosed, Those Were Not the Risks that Materialized.**

Plaintiffs cannot establish causation on Count II for a second, independent reason: even assuming Watson Wyatt failed to disclose certain risks relating to the Westridge investment, those were not the risks that materialized.  Accordingly, Plaintiffs cannot establish "loss causation."  "Loss causation . . . is the causal link between the alleged misconduct and the

economic harm ultimately suffered by the plaintiff.  [The Second Circuit has] often compared

loss causation to the tort law concept of proximate cause, meaning that the damages suffered by

plaintiff must be a foreseeable consequence of any misrepresentation or material omission."

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)

(citation and internal quotation marks omitted); *see also Suez Equity Investors, L.P. v. Toronto-*

*Dominion Bank*¸ 250 F.3d 87 (2d Cir. 2001).  "[A] misstatement or omission is the 'proximate

cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed*

by the misrepresentations and omissions alleged by a disappointed investor."  *Lentell v. Merrill*

*Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  The Fifth Circuit provided an illustrative

example of the difference between loss causation and "but for" causation in *Huddleston v.*

*Herman & MacLean*, 640 F.2d 534 (5th Cir. 1981), *aff'd in part, rev'd in part*, 459 U.S. 375

(1983):

> For example, an investor might purchase stock in a shipping venture involving a
> single vessel in reliance on a misrepresentation that the vessel had a certain
> capacity when in fact it had less capacity than was represented in the prospectus.
> However, the prospectus does disclose truthfully that the vessel will not be
> insured.  One week after the investment the vessel sinks as a result of a casualty
> and the stock becomes worthless.  In such circumstances, a fact-finder might
> conclude that the misrepresentation was material and relied upon by the investor
> but that it did not cause the loss.

640 F.2d at 549 n.25.

None of the so-called "risks" that Watson Wyatt allegedly concealed from Acument

related to the fraud that ultimately caused the Plan economic harm.  For example, Plaintiffs'

Complaint focuses on the fact that Westridge used derivatives and leverage.  Compl. ¶¶ 9, 51.

Although Plaintiffs contend that the use of derivatives and leverage made Westridge a "risky"

investment, they do not—and cannot—contend that one of the risks associated with the use of

derivatives and leverage is that the fund might be engaged in a fraud.  In other words, the

foreseeable risk of employing derivatives and leverage is, if anything, investment risk—the risk that the value of the Plan's investment would decrease—not fraud risk. There is simply no evidence in the record that Watson Wyatt was aware of—let alone failed to disclose concerns related to—*fraud risk*. Because Plaintiffs cannot prove that Defendants failed to disclose information suggesting that Westridge was, or might be, a fraud, they cannot prove "loss causation," and summary judgment should be granted with respect to Count II.

## III.    Watson Wyatt Did Not Fail To Act in Accordance with Plan Documents (Count III).

Plaintiffs also allege that Watson Wyatt improperly classified Westridge as a large cap equity investment, rather than a hedge fund, and that it was aware that Westridge was in fact a hedge fund. Accordingly, Plaintiffs allege, Watson Wyatt's recommendation resulted in the Plan over-investing in hedge funds and under-investing in large cap equity funds, in violation of the Plan's Investment Policy. Compl. ¶¶ 84-86, 94. Judgment should be entered for Defendants on Count III both on equitable estoppel grounds and because it is in conflict with the undisputed record.

### A.    Plaintiffs Should Be Estopped from Alleging that the Westridge Investment Violated the Investment Policy.

As explained in Part II.B.3 above, Mr. Talos, on behalf of Acument, signed the representation and warranty in the subscription agreement that he "reviewed, understands and has evaluated the investment objectives and strategy of the Fund, and has determined that an investment in the Fund *is consistent with the objectives of the Plan*." SUMF ¶¶ 90(b), 98 (emphasis added). In addition, he represented and warranted the accuracy of the representation (made by State Street) that "*the governing documents of the Plan permit the Plan to invest with the Company* and to invest, directly or indirectly through the Fund, in the assets in which the Fund intends to invest, as indicated in the Term Sheet." *Id.* ¶¶ 90, 104, 105 (emphasis added).

For the reasons provided in Part II.B.3 above, Plaintiffs should be equitably estopped from taking a position at trial that is inconsistent with these representations.  If Plaintiffs are estopped from taking a position inconsistent with Mr. Talos's representations, then they cannot prevail on Count III.

> **B.    The Undisputed Record Demonstrates That Westridge Was Appropriately Classified as a Large Cap Equity Investment.**

Judgment should be entered for Defendants on Count III even if Plaintiffs are not equitably estopped from taking a position inconsistent with Acument's representations. Plaintiffs' allegation in Count III is based on two assumptions: (i) it was *objectively wrong* for Watson Wyatt to classify Westridge as a large cap equity fund, rather than a hedge fund; and (ii) (iii) regardless of whether it was objectively wrong, Watson Wyatt in fact believed Westridge to be a hedge fund.  Both assumptions are addressed below.

First, it could not have been objectively wrong to classify Westridge as a large cap equity investment because that is how the investment community classified Westridge.  For example, eVestment, a subscription-based database on which Watson Wyatt relied in researching investment managers, classified Westridge as a U.S. equity fund.  *Id.* ¶ 42.  Similarly, Mercer Investment Consulting classified Westridge as a large cap equity fund; Qwest classified it as an equity fund; Wilshire Associates classified it as an Enhanced S&P 500 Index fund; and Hewitt Consulting classified it as an enhanced S&P 500 Index fund (a type of large cap equity fund).  *Id.* ¶¶ 20, 21, 23, 44.  Finally, Westridge classified itself as a large cap equity fund.  *Id.* ¶¶ 4(b), 45. In fact, Defendants are aware of no evidence that *any* investment advisor classified Westridge as a hedge fund.

Second, Watson Wyatt's *subjective* belief regarding Westridge's proper asset class is legally irrelevant.  *See McCabe*, 752 F. Supp. 2d at 405 (noting that a fiduciary must discharge

its duties "in an objectively reasonable manner according to the standards of others similarly situated"). Regardless, there is no evidence in the record that Watson Wyatt in fact believed Westridge to be a hedge fund. Watson Wyatt had classified Westridge as a large cap equity manager for nearly a decade. SUMF ¶ 41. Every Watson Wyatt employee to whom this question was posed has explained why he or she believed Westridge was properly classified as a large cap equity investment. *Id.* ¶¶ 43, 45, 46, 48. For example, Carl Hess, the then-president of Watson Wyatt Investment Consulting, explained that if an investment manager is managing to an index, such as the S&P 500, then it should be put in the asset class of that index.[18] *Id.* ¶ 43. Mr. Gold, a member of Watson Wyatt's hedge fund of funds ASK team, similarly explained that a manager's investment strategy, not its legal structure, is determinative of its asset classification. *Id.* ¶ 47. Ms. Fritz-Snyder, the head of Watson Wyatt's U.S. equities ASK team, echoed this view, noting that "[i]f it's a product that is built around the S&P 500—which is a stock index— then that would be where that kind of product would reside." *Id.* ¶ 48.

More relevantly, Watson Wyatt's classification of Westridge as a large cap equity manager was reasonable in light of its use of asset classes. The express purpose of Watson Wyatt's use of asset classes in client portfolios was to ensure portfolio diversification. *Id.* ¶¶ 52, 54-56. As stated in the Investment Policy under the heading "Diversification": "In developing strategic asset allocation guidelines for the Trust, an emphasis is placed on the long-term characteristics of individual asset classes, and the benefits of diversification among multiple asset classes." *Id.* ¶ 56. In other words, if the risks inherent in a large portion of the portfolio are correlated, then the portfolio as a whole is at risk; the purpose of asset classification is to avoid such concentration of risk. *Id.* ¶¶ 53, 54-56. In light of Watson Wyatt's express use of asset

---

[18]This view was echoed by both Acument's own expert Dr. Ram Willner, SUMF ¶ 49, and its former controller, Mr. McHugh, *id.* ¶¶ 50, 51.

classification, Westridge could only have been classified as a large cap equity manager as its correlation with the S&P 500 Index (based on its reported returns) was 99.98%. *Id.* ¶¶ 5, 57. By contrast, its correlations with the two benchmarks for the Plan's hedge fund of funds managers were 15% and 60%. *Id.* ¶ 57.

Watson Wyatt communicated its use of asset classification to Acument. The presentation Watson Wyatt provided Acument at the February 26, 2008 meeting expressly referred to "diversifying the sources of risk and return" as the focus of manager selection. *Id.* ¶ 54. In that same presentation, Watson Wyatt listed several criteria of hedge funds, the first of which was "[t]ypically aim for positive returns regardless of market direction, and performance that is fairly uncorrelated with mainstream markets." *Id.* ¶ 55. Mr. Talos, the chair of the Acument's Investment Committee, shared this understanding, testifying that "what [Watson Wyatt was] doing is, by employing hedge funds and using things like bond funds and mutual funds, they were trying to even out the flow so that we didn't have that big variation in what we were getting as income and return off the fund." *Id.* ¶ 53.

For all of these reasons, the record does not contain evidence on which the Court could conclude that Watson Wyatt breached its fiduciary duties by classifying Westridge as a large cap equity fund.

## IV.    Watson Wyatt Did Not Fail To Adequately Diversify Plan Assets (Count IV).

In the Complaint's final count, Plaintiffs contend that because Westridge should have been classified as a hedge fund, the Plan's investment in Westridge resulted in an "overweighting" of hedge funds in the portfolio and therefore violated ERISA's diversification requirements. Compl. ¶¶ 92-94. Judgment should be entered for Defendants on Count IV both on equitable estoppel grounds and because it is in conflict with the undisputed record.

**A.      Plaintiffs Should Be Estopped from Alleging that the Westridge Investment Violated ERISA's Diversification Requirement.**

As explained in Part II.B.3 above, Mr. Talos, on behalf of Acument, signed the representation and warranty in the subscription agreement that he "reviewed, understands and has evaluated the investment objectives and strategy of the Fund and has determined that an investment in the Fund . . . will, when coupled with the Plan's other investments, *satisfy the ERISA diversification requirements* as to the Plan."  SUMF ¶ 90(b) (emphasis added).  For the reasons provided in Part II.B.3 above, Plaintiffs should be estopped from taking a position at trial that is inconsistent with these representations.  If Plaintiffs are estopped from taking a position inconsistent with Mr. Talos's representations, then they cannot prevail on Count IV.

**B.      The Undisputed Record Demonstrates that the Westridge Investment Did Not Violate ERISA's Diversification Requirements.**

Judgment should be entered for Defendants on Count IV even if Plaintiffs are not estopped from taking a position inconsistent with Mr. Talos's representations.  For the same reasons as stated with respect to Count III, the Court should enter judgment for Defendants on Count IV because it merely repackages Count III's contention that Westridge should have been classified as a hedge fund, rather than a large cap equity investment.  The Court should enter judgment for Defendants on Count IV for the independent reason that the Westridge investment would not have violated ERISA's diversification requirements *even if Westridge were a hedge fund*.  ERISA's duty of diversification requires that a "trustee should not normally invest all or an unduly large portion of plan funds in a single security, or in any one type of security, or even in various types of securities *that depend on the success of one enterprise*."[19]  *Liss v. Smith*, 991

---

[19] This is consistent with the Department of Labor's Field Assistance Bulletin, which states that a fiduciary should instruct plan beneficiaries about the importance of portfolio diversification by providing plan beneficiaries the following information:  "To help achieve long-term retirement security, you should give careful consideration to the benefits of a well-balanced and diversified investment portfolio.

F. Supp. 278, 301 (S.D.N.Y. 1998) (internal quotation marks omitted) (emphasis added).  In

making this determination, "the Court is to consider (1) the purpose of the plan, (2) the amount

of plan assets, (3) financial and industrial conditions, (4) the type of investment, (5) the

distribution as to geographical location, (6) the distribution as to industries, and (7) the dates of

maturity."  *Id.*

Plaintiffs cannot meet this standard.  The Complaint contains no allegations relating to

this Count other than the conclusory claim that Westridge was a hedge fund.  Compl. ¶ 94.  The

report of Plaintiffs' expert, Mr. Lundelius, simply repeats this conclusory claim, without more:

"Because Westridge was in substance a hedge fund, Watson Wyatt caused a disproportionately

high percentage of the fund's money to be invested in hedge funds/alternative investments.

Conversely, too little was invested in true Large Cap Equity Funds (which were supposed to

amount to 22% of the Plan's investments)."  SUMF ¶ 58.  Accordingly, Plaintiffs' Complaint

contains no allegations, and their expert report contains no opinions, that satisfy the legal

standard for a claim for lack of diversification under ERISA.  *See Pension Benefit Guar. Corp.*

*ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705,

724 (2d Cir. 2013) (holding that the plaintiff's claim that Morgan Stanley "over-concentrat[ed]

the fixed-income portfolio in high-risk, mortgage securities" could not survive a motion to

dismiss without further factual allegations) (alteration in original) (internal quotation marks

omitted).

---

*Spreading your assets among different types of investments can help you achieve a favorable rate of
return, while minimizing your overall risk of losing money.*  This is because market or other economic
conditions that cause one category of assets, or one particular security, to perform very well often cause
another asset category, or another particular security, to perform poorly."  Dep't of Labor, Field
Assistance Bulletin No. 2006-03, at *6 (Dec. 20, 2006) (emphasis added) (internal quotation marks
omitted).

For the same reason that Westridge was reasonably classified as a large cap equity manager, its inclusion in the Plan's portfolio did not cause an overweighting of hedge fund investments.  Westridge's reported returns had a 99.98% correlation with the S&P 500 Index (the Plan's large cap equity benchmark), and a 15% and 60% correlation with the two benchmarks for the Plan's hedge fund of fund managers.  SUMF ¶¶ 5, 57.  Accordingly, Westridge's returns were not overly correlated with the hedge fund investments, regardless of how Westridge was classified.  As the Second Circuit explained in *Pension Benefit Guaranty*, "'mortgage-backed securities' is a broad category, diverse in the degree of risk and reward in the various financial instruments that fall within that category.  Yet the Amended Complaint does not even assert, much less plausibly show with factual allegations, that the share of mortgage-backed securities in the Citigroup BIG reflects an upper limit on the percentage of mortgage-backed securities that can be held by a properly diversified ERISA plan whose focus is long-term growth."  712 F.3d at 725.  Plaintiffs' invocation of the "broad category" of "hedge funds" is similarly defective, and therefore, judgment should be entered for Defendants on Count IV.

## CONCLUSION

For all these reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment on Counts I-IV in Plaintiffs' Complaint.


Dated: June 30, 2014

                                        Respectfully submitted,


                                        By: /s/ Alex G. Romain

                                        Stephen L. Urbanczyk
                                        Alex G. Romain
                                        Vidya Atre Mirmira
                                        Eli S. Schlam
                                        Michael H. Page

Adam G. Yoffie
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005

Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for Defendants-Third-Party Plaintiffs
Towers Watson & Co. and Towers Watson
Investment Services, Inc.*